[No. 1497.]

## JAMES SMITH *v*. THE STATE.

1. MURDER—PRACTICE—CHARGE OF THE COURT.—It is the duty of the trial judge to measure his charge by the evidence adduced, and give instructions to the jury as to every legitimate deduction to be drawn from the evidence; but when he has done this the law's demand's are satisfied. Hence, in the trial of a murder case, when the evidence totally fails to raise an issue of a lower degree of homicide than murder in the first degree, the court need not charge upon the lower grade of homicide.
2. SAME.—Errors in a charge of the court, unless calculated to injure the rights of the defendant, will not be revised by this court, in the absence of exceptions taken at the time, and unless special instructions were asked and refused.
3. NEW TRIAL.—When it appears that a motion for new trial has not been filed within the time prescribed by law, this court will not interfere, even in the event of error, unless it appears that the trial judge had abused his discretion, to the prejudice of the accused.
4. MURDER—FACT CASE.—See evidence held sufficient to sustain a verdict for murder in the first degree.

APPEAL from the District Court of Wood.   Tried below before the Hon. J. C. Robertson.

The indictment in this case charged James Clinton and the appellant, jointly, with the murder of Bob Jones, in Wood

county, Texas, on September 15, 1878. The appellant, being separately tried, was found guilty of murder in the first degree, and his punishment was affixed at confinement in the penitentiary for life.

Sallie Walton was the first witness for the State. She testified that, on the fifteenth day of September, 1878, she was the wife of the deceased. On the morning of that day, which was Sunday, the defendant came to her house, and asked the deceased to go with him to the house of Ann Burford, who lived about three miles distant in a southwest direction, and aid him in driving a cow which he had there. The deceased declined, saying that he had promised the witness to care for the children that day, to enable her to go to church. Defendant insisted, and, under a promise not to be gone long, finally prevailed upon the deceased to go. He then borrowed a pair of saddle-bags from the deceased, in which to carry his pistol, which he had brought to the house wrapped in his coat. When they got ready to start, defendant suggested that deceased should take his gun. Deceased refused, saying that he did not like to carry it on Sunday. Defendant said he would carry it, and took it from the rack. and the two left on horseback, going in the direction of Ann Burford's house. The defendant rode a small iron gray, and the deceased a bay pony.

A few minutes after eleven o'clock, Gus Walton, who lived about two hundred yards from the witness and deceased, came to the church for the witness and told her that the defendant was at his house and wanted to see the witness. Witness went to Gus Walton's and found the defendant there. He told the witness that a negro and a white man had taken the deceased from him in the woods, for some crime that the deceased had committed out west, two years previously, and that he was uneasy about the deceased. He would only designate the point where the deceased was taken from him as "down there in the woods or bottom." He said that perhaps the deceased would return that night, and, leaving the saddle bags, started off with the deceased's gun. The witness asked him for the gun, and he replied that he had bought the gun from the deceased, and paid him twenty dollars for it—that that matter was none of witness's business. He left Gus Walton's about twelve o'clock, having remained but few minutes after witness got there. After waiting some time for the deceased, the witness requested Gus Walton to get some men and scour the woods for the deceased, but

Walton could not, or did not, get any men until next morning. The witness, growing uneasy, later that evening took the road the defendant and deceased had gone, and tracked their horses toward Ann Burford's house until they came to an old road in Sandy creek bottom, where they turned north, up the bottom, leaving the route to Ann Burford's, and going in the direction of Gillespie's old mill. This trail witness followed a short distance, and then returned. As far as she went she tracked the horses of the defendant and deceased going, and that of the defendant returning.

Next morning witness accompanied Gus Walton, and a party of men he had secured, over the same route she had taken the evening before, to and beyond the point where she turned back. From this point they followed the trail of the two horses going, and that of defendant returning, up the road towards the old mill, until they came to a point in the road where they had stopped in Sandy bottom. Here the two tracks, joined by those of a mule, showed that the animals had run off the road into the bottom, east. This trail they followed about two hundred yards into the bottom, and found the dead body of the deceased. Two bullets had entered his body, one at the breast and the back of his head, which must have been fired from close behind him, as his hair was burned. The party tracked the deceased from the road to the point where they found his body. He was evidently running on the ground. His tracks could be seen in some places, and at others could be seen where he ran through the bushes and briars. His hat was found about twenty steps behind where he was lying. He was lying on his face, his head pointing east, the direction in which he was running.

The party found the body about ten o'clock that day, and remained with it during that day and the succeeding night, and until Tuesday morning, when Mr. Morrison, the justice of the peace, arrived with a jury and held an inquest. The body was searched, and the pockets turned wrong side out, but no money was found on his person. The body was buried, and the coroner and his jury went up to the old mill to get a writing place, where evidence was taken. The witness saw no more of defendant after he left Gus Walton's, on Sunday morning, until Tuesday morning, when he and James Clinton came to the old mill, while the evidence in the case was being taken. The defendant had the deceased's gun with him at that time. He and Clinton rode behind the witness and her party on their return

home, until they reached Mr. Skiles's, between the mill and deceased's house, where they stopped, and the witness and party went on home. Skiles lived about two miles from the witness. Defendant and his family lived with his wife's father, about two miles from witness, and Clinton lived near the defendant. Witness saw no more of the defendant after the day of the inquest, until the fall of 1882. His family did not leave the neighborhood. Witness and deceased had lived in the neighborhood for nine years at the time of the killing. The deceased had never been out west during those nine years; this the witness knew, and if he had ever been out west she did not 'know it. The deceased was a negro; the defendant, James Clinton and George Skiles were white men.

Cross-examined, the witness stated that she had known the defendant for eight or ten years, and so far as she knew, the defendant and the deceased had always been friendly. She had never known of their having a difficulty. The deceased had worked for the defendant, and the latter had always paid. The deceased borrowed some money from the defendant once, but he had repaid it. Clinton and Skiles once had a row with the deceased about some cows which the deceased had in charge for Mr. Walton. They came to the house and Clinton said that Mr. Walton had sent for the cattle. The deceased said that he knew nothing about their authority, and refused to deliver them. Clinton cursed the deceased, turned the cattle out, and he and Skiles drove them off. The deceased did not curse back or say a word out of the way. Witness knew nothing of a subsequent difficulty between deceased and Clinton about fodder. Witness was sworn at the inquest. Clinton and defendant were not, that she knew of. They came to the inquest just before those at the inquest got ready to go home, and were the only parties at the inquest whom the witness saw with arms. Witness had married a man named Walton, a brother of Gus Walton, since the death of Jones.

F. P. Dowell testified, for the State, that he was district clerk of Wood county from 1876 to 1878, and during his term of office issued a *capias* for the arrest of the defendant for the murder of the deceased, and delivered it to the then sheriff, J. P. Williams, now deceased. Williams never arrested defendant. Witness was sheriff of Wood county in 1879 and 1880. He had a *capias* for the arrest of defendant, who, with Clinton, was charged with the murder of deceased. He searched for him in Wood county,

but could not find him. He received him in the summer of 1882 from the sheriff of Hays county. Defendant's family never left Wood county. •

Cross-examined, the witness stated that he had never, to his knowledge, seen the defendant before the summer of 1882, when he received him from the sheriff of Hays county, and could not say that defendant was out of Wood county constantly after 1878; could only say that when sheriff he had searched for him in Wood county and could not find him.

James Wheeler, one of the jury of inquest, described the position of the body and the vicinity where it lay, precisely as these descriptions were given by the witness Sallie Walton. Either of the wounds, he thought, would have produced death, and he knew that the one through the head was mortal. The inquest was held on Tuesday. The deceased appeared then to have been dead two or three days, as his body was fly-blown and much swollen. Several parties were present when the jury of inquest reached the body. A thorough examination disclosed nothing of any kind of value—no article of any kind but a piece of home-made tobacco. An examination of the vicinity disclosed the tracks of two horses and a mule, "leading from the road to the place where the body of Bob was found, one on either side of where he traveled. I could see where he went; saw where he ran behind a tree, about thirty steps from the road, where it seemed some horse tracks had met together. I found a bullet hole in the tree, about waist high, that seemed to be fresh. The bullet hole was in the side of the tree next to the road, and where the horses seemed to stop in the road. We noticed where a horse had run off a short distance southeast and returned. I noticed where three persons had sat down on the grass by the side of the road where the horses had met and stopped."

The body was buried where it lay, and the inquest adjourned to the old mill, where water and writing facilities could be had. The witnesses were sworn at the mill; Sallie Walton, then Sallie Jones, and Gus Walton among others. The defendant and Clinton did not get to the mill while the witness was there, that he saw. Witness did not know either of them, and he, witness, was about the first to leave the mill. The body of the deceased was not found on the road from his house to Ann Burford's, but north or northwest from that road, and some four miles from Ann Burford's.

Cross-examined, the witness stated that several parties were

about the body when he arrived, among others Sallie Walton and Gus Walton. The body appeared to be lying just as it fell. It did not appear to have been moved. At the inquest suspicion rested on the defendant.

Gus Walton testified, for the State, that, on the Sunday deceased disappeared, the defendant came to his house and told him that he wanted to see the deceased's wife, who was not at home. Witness went to the church and brought her, and thenceforward, as to what passed between Sallie and defendant, and other transactions up to the discovery of the body, except Sallie's individual search on the evening of Sunday, the witness corroborated Sallie in detail. On Monday morning the witness, Sallie, Mr. Dock Mayfield and two or three other parties took the trails and followed them a short distance on the road towards Ann Burford's, until they came to an old road leading up Sandy bottom towards Gillespie's mill. They followed this old road some distance and found where the horses had come to a halt, and seemed to meet with a horse and mule. They found the track of the defendant's horse, or of one the witness took for it, leading back towards deceased's house. From here witness and Mr. Mayfield went in search of the deceased. They found the grass mashed down where some persons had been sitting down on the roadside. They saw where two horses and a mule had gone into the bottom east of the road, and down a kind of slough, and where one horse had gone west of the road. They saw the tracks of a man, who seemed to have been running, from the way the bushes and briars were torn apart, and from the signs of the tracks where they could be seen. They saw where he had run around a tree about thirty or forty steps from the road, in which tree there was a fresh bullet hole on the west side, which was next to the road. From this tree the witness followed some of the horse tracks, and was not far from Mayfield when the latter found the body, in a low clean place, surrounded with bushes. The body lay on the face. One ball had penetrated the right breast, and another the head from the rear, the discharge of the weapon inflicting this last wound burning the hair. They guarded the body until next morning, and sent for the officers. By Mr. Mayfield's orders the body was not moved or disturbed before the officers arrived. Thenceforward the testimony of this witness was a complete corroboration of the testimony in chief of Sallie Walton, except that, in addition he said that the deceased's horse, with bridle and saddle on, was

found some two or three hundred yards east of the body and west of the road. Defendant and Clinton reached the mill on that morning after the testimony had been completed.

Cross-examined, the witness stated that, so far as he knew, the deceased and the defendant were friendly, and he knew that they worked together. He had seen the deceased hoeing in the defendant's field. He knew nothing about the defendant having loaned money to the deceased. Witness and the defendant were friends. The defendant at the last term of the court fed the witness and other witnesses for the State; appeared very friendly to them, and gave them something to drink.

George Skiles was the next witness for the State. He testified that he knew the defendant and Clinton, and was acquainted with the deceased in his lifetime. The deceased was killed on a Sunday, the witness believed the fifteenth day of September, 1878. On that morning, about nine o'clock, while witness was hitching up to go for some hogs, Clinton came to his house and requested witness to go with him after a cow, down on Sandy. He insisted, and witness reluctantly ungeared his horses, saddled one, and started with him. They started south, going thence around by Gillespie's old mill, which was about one mile west of witness's house, and about two miles west of the deceased's. They then turned south or southeast down an old road through Sandy bottom. After traveling about a half mile they met the deceased in the road, at a thick, lonely looking place, where the road had nearly grown up with chincapin bushes. At the time of the meeting witness and Clinton were riding side by side, and the deceased and the defendant were riding in like order. Clinton dropped a little behind. Witness rode on opposite to defendant, their horses' shoulders being about even. Deceased passed on around and stopped near Clinton. The party had scarcely stopped when the witness heard Clinton swear, and instantly a pistol fire. Witness's horse ran with him some eighty yards down the old road before witness could get him under control. When he did get him checked he looked back and saw the deceased off his horse, running on foot east of the road, followed by Clinton on horseback. The defendant was moving in the same direction, but did not go far from the road. Clinton shot again, and shortly came back and said: "Boys, by G—d, he is lying down there." The defendant asked Clinton if Jones was dead. Clinton replied that he did not know, but supposed he was. Defendant said: "By G—d,

shoot him again." Clinton said: "No, Smith, my d—d old pistol snapped; you go shoot him." The defendant then pulled a pistol from his saddle bags, and said: "Here, Clinton, take this one and go and shoot him; it never fails." Clinton then said: "By G—d, this is the eleventh nigger I have killed." Defendant replied: "I have killed one before, but I did it a d—d sight quicker than you did this." At this point of the conversation witness asked: "Clinton, what sort of a thing is this you have got me into?" Clinton replied: "By G—d, Skiles, aren't you solid?" and defendant said, "Skiles, are you going to tell it?" Witness replied that he did not expect to tell it, and feeling uneasy, he left the parties standing there, the defendant on his horse, Clinton on his medium sized mule. Witness returned home by the same road he had taken, and after he had gone a few yards off he saw the deceased's horse on the west side of the road, feeding west.

The witness hurried home and related what had occurred to his wife, and told her that he was alarmed. She prepared dinner immediately; after which the witness rode over to Mr. White's, intending to consult him about the matter. He reached White's just as Clinton rode up, and just as the Whites finished dinner. Clinton ate his dinner at White's, during which he laughed and joked as though nothing unusual had happened. Clinton remained at White's until so late that the witness left— leaving him at White's. He saw no more of Smith or Clinton until after dinner on the following Tuesday, when they came to his house together, and asked witness to go with them to the mill, where the inquest was being held, as they wished to ascertain if any one, and who, was suspicioned. Witness refused to go, pleading engagements, and they left, saying that they supposed the people would erect a monument over the nigger's grave. They returned that evening by witness's house, and asked witness what he was going to do—if he was going to tell. Witness promised them that he would not tell. On the following Tuesday the witness was arrested in his cotton patch. Witness went quietly with the officers to Quitman, and found that the defendant had filed a complaint against him on the previous Wednesday, charging him with the murder of the deceased. Witness stood his trial on the complaint, and was acquitted, and no bill of indictment was ever returned against him that he knew of. Neither the defendant nor Clinton appeared at the trial on the complaint to prosecute him. Witness thereupon

made a sworn statement of all the facts in the killing of the deceased. Witness never left his home neighborhood after the killing; had never seen Clinton since, nor did he afterwards see Smith until the fall of 1882, when he was taken to Mineola to attend the latter's trial on habeas corpus.

Witness, on his cross-examination, denied that he ever told Dowell, ex-sheriff, that when his horse ran off at the first fire, he, witness, did not again return to the parties. He at no time told Hart, defendant's attorney, in the presence of Dowell, that Smith had nothing to do with the killing. He told Hart in substance just what he has told on this trial—if not as full as to the particulars, because he was not asked. The witness had nothing to do with Clinton's cattle, either before or after the killing, and knew nothing about them. He owned a cow which he bought of Walton, called the Jas. Clinton cow, because she was a cow that Clinton had milked, though she never, at any time, belonged to Clinton. Witness also had a cow he bought from a man named J. Clinton, or J. C. Clinton, who drove stock through to the west. Witness gave B. F. Read & Co. a mortgage on his stock of cattle and crop, for supplies furnished in 1880. He did not remember how that mortgage described the cattle, nor what cattle was included in it, nor that it included cattle described as the Clinton cattle. If so, the description referred to the cow known as the Clinton cow, for he had before then traded off the cow he got from the other Clinton. The mortgage being produced, witness said that the Clinton cow described in it referred to the Walton cow which Clinton had milked, and which since had been known as the Clinton cow. Witness did not know that Clinton and deceased had ever had a difficulty about fodder, though about a year before the killing Clinton told him that he and deceased had some words about fodder.

Continuing, on cross-examination, the witness said that he and Clinton went to deceased's after Walton's cattle, under Walton's instructions. Deceased refused to deliver them, as he had not seen Walton, whereupon Clinton turned the cattle out of the pen, and they drove them off. Clinton may have used some oaths, but there was no row about it. Witness last saw Clinton a short time after the killing, when he came to witness's house and asked entertainment for the night, which witness refused. Witness went fishing once with Clinton and defendant, and was friendly with both, though neither had ever eaten at

his table. Clinton and the defendant always appeared to be on friendly terms. The State closed.

F. P. Dowell was the first witness for the defense. He testified that he remembered going with attorney Hart to see Mr. Skiles about this killing during the previous year. Skiles said, as near as the witness could remember, that Clinton came to his house on the morning of the killing, and got him to go cow hunting with him in the Sandy bottom; that Clinton had an army six shooter; that they met defendant and deceased in Sandy bottom; that deceased passed by him and stopped near Clinton; that he rode up to defendant; that he and defendant had about stopped when Clinton's pistol fired, and his, Skiles's, horse ran off a piece, and he turned back and saw Clinton and defendant after the deceased. Witness did not now remember whether Skiles said whether it was Clinton or defendant fired the last shot, or whether he said that defendant told Clinton to shoot the deceased again. Skiles did not, in that or any other conversation, with or in the hearing of witness, say that defendant had nothing to do with the killing.

A. Finney testified, for the defense, that in the spring of 1882 he heard Clinton say that deceased had given him a cursing about some fodder, and that he would make the deceased his eleventh nigger. He threatened to kill deceased. Witness could not remember that any one was present at this conversation. Witness had never related it to defendant until his arrest.

H. Lewis testified, for the defense, that he was at Gus. Walton's the day the defendant told that some parties had taken the deceased away from him. Witness could not remember what the defendant did say—either that they killed the deceased or took him away.

Deputy sheriff Terrell testified, for the defense, that he went to Longview last spring to receive the defendant from the sheriff of Hays county. Defendant made no effort to escape, and appeared very quiet. Shortly afterwards he was released on bond. Cross-examined, witness stated that he kept a close watch on defendant, and knew that he could not have escaped.

Deputy sheriff J. L. Pogue testified, for the defense, that he acted as deputy sheriff in 1882, and as such officer, during that year, went to Upshur county in charge of the defendant, who was taken there to answer the charge of murder of a negro, committed several years ago.

The motion for new trial assailed the charge of the court on

various grounds, and alleged surprise by the testimony of the witness Skiles, in this, that the defendant had been led to believe that Skiles would testify to facts of the killing exactly as he had previously stated them to absent witnesses, which, if as stated by the witness Skiles, would have shown the innocence of the defendant beyond peradventure, and that his presence at the time was purely accidental. The motion was overruled.

*Hart & Buchanan* filed an able brief and argument for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE. 1. It was not error for the court to omit from its charge to the jury the law of murder in the second degree. There was no evidence fairly presenting that issue. If the defendant was guilty at all, he was clearly guilty of murder in the first degree. We think the evidence of express malice, and of motive actuating the defendant in acting together with Clinton in the commission of the murder, is amply sufficient to show murder in the first, and to exclude murder in the second degree. Where the evidence shows murder in the first degree, as we are clearly of the opinion that it does in this case, a charge on any lower degree of homicide is not required, unless there be some evidence which fairly raises an issue as to such lower degree, and we find no such evidence in this record. (*Washington* v. *The State,* 1 Texas Ct. App., 647; *Hubby* v. *The State,* 8 Texas Ct. App., 597.) "It is the duty of a trial judge to measure his charge by the evidence adduced, and to give instructions to the jury as to every legitimate deduction to be drawn from the evidence; but, when he has done this, the law's demands are satisfied." (*Lum* v. *The State,* 11 Texas Ct. App., 483.) It has been well said, however, that in all prosecutions for murder, generally, it is the safer practice to instruct as to both degrees.

2. Other objections to the charge of the court have been presented in argument by counsel for defendant, but no exceptions were taken and saved at the time the charge was given to the jury, and no additional instructions were requested by the defendant, and if there be any error in the charge, it is not such an one as was calculated to injure the rights of the defendant, but after a careful scrutiny of the charge, we have failed to perceive

any material error whatever; on the contrary, we think it was full, fair, correct, and directly applicable to the facts in evidence.

3. We think there was no error in overruling the defendant's motion for a new trial; but, if there was, the action of the trial court would not be revised by this court unless the exercise of the discretion of the former court had been abused to the defendant's prejudice; because it appears from the record that the motion for new trial was not filed within the time required by law. (Code Crim. Proc., Art. 779; *White* v. *The State*, 10 Texas Ct. App., 167.)

There being no error apparent, in the record, the judgment is affirmed.

*Affirmed.*